1  CRDR LAW GROUP
   Craig Munson (SBN # 143833)
2  7528 Clybourn Ave.
   Sun Valley, CA 91352
3  Phone: (818) 771-0380

4

5  Attorney for Plaintiff

6

7

8                    UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES

10

11 SRBOUI ESKIDJIAN,                   Case No. 2:13-cv-03163-JAK-VBK

12                                     SECOND AMENDED COMPLAINT FOR
                Plaintiff,
13
                                       1. FRAUD
14 vs.                                 2. VIOLATIONS OF THE
                                          HOMEOWNERS' BILL OF RIGHTS
15 WASHINGTON MUTUAL BANK, FSB; JP     3. NEGLIGENT
   MORGAN    CHASE    NATIONAL            MISREPRESENTATION
16 CORPORATE    SERVICES,   INC.;      4. VIOLATION OF BUSINESS &
   CALIFORNIA    RECONVEYANCE             PROFESSIONS
17 COMPANY, a Business Entity; PACIFIC 5. PROMISSORY ESTOPPEL
   VALUE OPPORTUNITIES FUND II, LP;
18 and Does 1-10 inclusive,
                                       JURY TRIAL DEMANDED
19
20              . Defendants.

21

22

23

24       COMES NOW Srboui Eskidjian, hereinafter "Plaintiff," and complains the following of

25 each Defendant:

26 ///

27 ///

28

                    SECOND AMENDED COMPLAINT

## STATEMENT OF THE CASE

1.     On August 04, 2006 Plaintiff executed a promissory note ("Note") in favor of Washington Mutual Bank, FSB ("WAMU), (now a defunct entity) in the amount of $700,000 secured by a deed of trust ("Deed of Trust" or "Mortgage") for the finance of real property located at 410 S. Bel Aire Drive, Burbank, CA 91501. In the beginning of 2008, WAMU became insolvent and was closed by the Office of Thrift Supervision. WAMU was then placed into the receivership of the Federal Deposit Insurance Corporation ("FDIC") and in September 2008, Defendant JPMorgan Chase ("CHASE") acquired the servicing rights of the Plaintiff's loan from Washington Mutual through the FDIC.

2.     Plaintiff is informed and believes that CHASE claimed to be the holder of Plaintiff's promissory note and deed of trust which Plaintiff disputes.

3.     Plaintiff is informed and believes that defendant CHASE and/or all its subsidiaries or agents are not the party or person entitled to enforce Plaintiff's note or security instrument.

4.     Plaintiff is informed and believes that defendant CHASE does not have the legal title to Plaintiff's property. As such, Defendant had no authority to collect on the Note and enforce the Deed of Trust. Defendant CHASE never perfected a security interest on Plaintiff's loan or deed of trust.

5.     Plaintiff's information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; (3) her own research, experience, and extensive review of title report, case law, correspondence, news articles, reports, complaints by Attorneys General from various states, and publicly available records and documents; (4) a review of the purported "Notice of Default and Election to Sell" signed by "Colleen Irby" (**Exhibit "A"**); and (5) a review of the purported "Notice of Trustee's Sale" signed by "Deborah Brignac." (**Exhibit "B"**).

6.     On or about February 05, 2009, Plaintiff initiated negotiations with CHASE/WAMU toward a loan modification by calling 866-926-8937 and speaking with CHASE/WAMU representative Victoria in the Loss Mitigation Department. In turn, CHASE/WAMU supplied a financial packet in March to be completed by Plaintiff and returned by April 30, 2009.

7.     On or about July 10, 2009 CHASE/WAMU informed Plaintiff that she had been approved for a TPP, which CHASE/WAMU called a "Trial Plan Agreement." The approval letter stated: "Since you have told us you're committed to pursuing a stay in home option, you have been approved for a Trial Plan Agreement. If you comply with all the terms of this Agreement, we'll consider a permanent workout solution for your loan once the Trial Plan has been completed." In July 2009, Plaintiff entered into the Trial Plan Agreement with CHASE/WAMU. The Trial Plan Agreement required Plaintiff to make an initial payment of $2,833.09 by September 01, 2009, and additional payments in that amount of $2,833.09 on October 01 and November 01, 2009. The Trial Plan Agreement stated: "If you do not make your payments on time, or if any of your payments are returned for nonsufficient funds, this Agreement will be in breach and collection and/or foreclosure activity will resume."

8.     Plaintiff made all three payments timely under the Trial Plan Agreement and continued thereafter to make monthly payments in the required amount. Plaintiff ultimately made thirteen (13) TPP payments before her #13 payment was rejected by CHASE/WAMU without any justification and was subsequently dropped from her Loan-Modification program in August 2010.

9.     After learning that she was dropped from her Loan-Modification program and TPP plan without any justification, Plaintiff contacted CHASE and was told by CHASE representative that it was a mistake and that her status will be reinstated immediately. However, that was not the case and she was never reinstated nor did she receive a final Loan-mod agreement, instead

1  she was instructed by CHASE that in order to be reinstated, she would need to reapply for the

2  loan modification again.

3  10.    Between August, 2010 and January, 2013 Plaintiff participated in the charade of "re-

4  submitting" the same information requested by the bank no fewer than nine times. Plaintiff's

5  most recent full financial packet submittal was on or about January 07, 2013 which was

6  confirmed received by CHASE representative on or about January 14, 2013. Shortly thereafter

7  on or about February 08, 2009 CHASE issued approval of new TPP with a first payment due

8

9  date of March 01, 2013 in the amount of $2,956.49, which was received by Plaintiff on or about

10  February 11, 2013. However, CHASE breached the TPP agreement by proceeding with

11  foreclosure sale of the subject property on February 13, 2013, through its wholly-owned

12  subsidiary agent California Reconveyance Company (CRC) by wrongful and illegal means.

13  11.    Plaintiff seeks damages resulting from Defendants' unlawful conduct and a declaratory

14

15  judgment establishing that Defendants have failed to substantiate a perfected security interest in

16  the Note and Deed of Trust (collectively referred to as "Loan"). Simply put, Defendants had no

17  legal, equitable, or pecuniary interest in the Note and Deed of Trust in order to foreclose

18  Plaintiff's property.

19  12.    In the alternative, if the Court finds that any of the Defendants have an enforceable

20

21  security interest in either the Note or Deed of Trust, Plaintiff maintains that Defendants have

22  breached Section 2 of the Deed of Trust and the Implied Covenant of Good Faith and Fair

23  Dealing, by charging improper fees and miscalculating and misapplying payments to offset both

24  principal and interest.

25  **JURISDICTION AND VENUE**

26  13.    This Court has original jurisdiction over the claims of this action based on 28 U.S.C.

27  §§1331, 1343, and 42 U.S.C. §1983 which confer original jurisdiction on federal district courts

28  to address the deprivation of rights secured by federal law.  This Court also has supplemental

4
**SECOND AMENDED COMPLAINT**

1    jurisdiction over the pendant state law claims because they form part of the same case or

2    controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. §1367.

3    14.   The Property, which is the subject of this suit, is located within the County of Los

4    Angeles, State of California.   Therefore, venue properly lies in this District, pursuant to 12

5    U.S.C. §2614 and 28 U.S.C. §1391(b).

6

7                                        **PARTIES**

8    15.       Plaintiff is the resident and owner of the property located at 410 S. Bel Aire Drive,

9
10   Burbank, CA 91501, (hereinafter referred to as the "Property"), which is the subject of this

11   litigation.

12   16.   Plaintiff is informed and believes, and thereon alleges, that Defendant WAMU is a

13   federal savings bank whose last known business address is 1201 3rd Ave., WMT 1706, Seattle,

14   WA 98101. Plaintiff alleges that WAMU is the original lender under Plaintiff's Deed of Trust.

15   17.       Plaintiff is informed and believes, and thereon alleges that Defendant CRC, is a

16   corporation authorized to do business in the State of California.  Plaintiff alleges that CRC is

17
18   the original trustee under Plaintiff's Deed of Trust and whose last known business address is

19   9200 Oakdale Avenue, CA2-4379, Chatsworth, CA 91311.

20   18.   Plaintiff is informed and believes, and thereon alleges that Defendant CHASE, is a

21   corporation authorized to do business in the State of California.  Plaintiff alleges that CHASE

22   is the servicer of Plaintiff's Note and whose last known business address is 270 Park Ave.,

23   New York, NY 10017.

24
25   19.   Plaintiff is informed and believes, and thereon alleges that Defendant Pacific Value

26   Opportunities Fund II, LP (PVO) is a limited partnership authorized to do business in the

27   State of California.  Plaintiff alleges that PVO purportedly purchased Plaintiff's home at a

28   trustee's sale on February 13, 2013, and whose last known address is 10990 Wilshire Blvd.,

Suite 420, Los Angeles, CA 90024

20.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, and therefore sue these Defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

21.    The use of the term "Defendants" in any of the allegations in this complaint, unless specifically otherwise set forth, is intended to include and charge both jointly and severely, not only named Defendants, but all Defendants designated as Does 1 through 10, as well.

22.    Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants are contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for each and every act, omission, obligation, even or happening set forth in this complaint, and that each of said fictitiously named Defendants are indebted to Plaintiff as hereinafter alleged.

23.    Plaintiff is further informed and believes, and thereon alleges, that at all times herein mentioned Defendants were agents, servants, employees, alter egos, superiors, successors-in-interest, joint venturers and/or co-conspirators of each of their co-Defendants and in doing the things herein after mentioned, or acting within the course and scope of their authority of such agents, servants, employees, alter egos, superiors successors-in-interest, joint venturers, and/or co-conspirators with the permission and consent of their co-Defendants, and consequently each Defendants named herein, and those Defendants named herein as Does 1 through 10, inclusive, are jointly and severally liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

24.    Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with

1  an awareness of its primary wrongdoing and realized that its conduct would substantially

2  assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

3  25.    Defendants, and each of them, knowingly and willfully conspired, engaged in a common

4  enterprise, and engaged in a common course of conduct to accomplish the wrongs

5  complained of herein. The purpose and effect of the conspiracy, common enterprise, and

6  common course of conduct to accomplish the wrongs complained of herein. The purpose and

7  effect of the conspiracy, common enterprise, and common course of conduct complained of

8  was, inter alia, to financially benefit Defendants at the expense of Plaintiff by engaging in

9  fraudulent activities. Defendants accomplished their conspiracy, common enterprise and

10  common course of conduct by misrepresenting material information regarding the servicing

11  of loans, and by taking steps and making statements in furtherance of their wrongdoing as

12  specified herein. Each Defendant was a direct, necessary and substantial participant in the

13  conspiracy, common enterprise and common course of conduct complained of herein, and

14  was aware of its overall contribution to and furtherance thereof. Defendants' wrongful acts

15  include inter alia, all of the acts that each of them are alleged to have committed in

16  furtherance of the wrongful conduct of complained of herein.

## FACTUAL ALLEGATIONS

26.    On August 04, 2006, Plaintiff executed a series of documents including a Promissory

Note in favor of WAMU, recorded in the Official Recorder's Office for Los Angeles County

as Instrument No. 061776887, in the amount of $700,000.00 secured by a First Deed of Trust

("DOT") on the Property commonly known as 410 South Bel Aire Dr., Burbank, CA 91501.

(**Exhibit "A"**). The Home is further described as Assessor's Parcel Number 2456-035-025:

> ...PARCEL 2 OF PARCEL MAP NO. 4395, IN THE CITY OF BURBANK,
> COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
> RECORDED IN BOOK 50 PAGE 33 OF PARCEL MAPS OF MAPS, IN THE
> OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

27.  Plaintiff is informed and believes, and thereon alleges, that at some point after she executed her loan, CHASE acquired an interest in WAMU and began servicing her loan.

28.  Plaintiff is informed and believes, and thereon alleges, that she began experiencing economic hardship.

29.  Plaintiff alleges that shortly thereafter she sought financial relief directly with CHASE/WAMU and submitted several documents for a loan modification. Beginning on February 05, 2009, Plaintiff initiated negotiations with CHASE/WAMU toward a loan modification by calling 866-926-8937 and speaking with CHASE/WAMU representative Victoria in the Loss Mitigation Department. In turn, CHASE/WAMU supplied a Loan-Mod financial packet in March and instructed Plaintiff to return the completed application by April 30, 2009.

30.  However, Defendant CRC, on behalf of CHASE, recorded a Notice of Default (**Exhibit "B"**) on March 23, 2009 in the Official Recorder's Office for the County of Los Angeles as Instrument No. 20090409488. Plaintiff contacted CHASE/WAMU, in response to receiving the NOD and was told by a CHASE/WAMU representative, no foreclosure proceedings will be initiated while the loan modification application is pending.

31.  Plaintiff submitted a complete loan modification application on April 28, 2009 to CHASE/WAMU in a timely manner, before the due date of April 30, 2009.

32.  On May 12, 2009, Plaintiff called CHASE/WAMU at phone number 866-926-8937 and confirmed with representative Mary that CHASE/WAMU received her loan modification application. Plaintiff was advised to contact Defendants again to obtain an update within 30 days.

33.  On May 19, 2009, Plaintiff called CHASE/WAMU again for an additional update. Plaintiff was told that her paperwork was under review and that she should contact CHASE/WAMU again in thirty (30) days for an update.

34.    On June 23, 2009, Plaintiff called again for an update on her status and spoke with a representative named Magdalene and was told that she may soon receive her trial period payment plan. Plaintiff was also told that if she has not received her trial period payment plan paperwork in the next thirty days, to call back for an update.

35.    On or around July 2, 2009, CRC, on behalf of CHASE, recorded a Notice of Trustee's Sale (**Exhibit "B"**) in the Official Recorder's Office for Los Angeles County, as Instrument No. 2009099578 showing the sale date of July 28, 2009.

36.    On or about July 10, 2009 Plaintiff received her trial plan agreement that was issued by CHASE/WAMU on July 01, 2009. (**Exhibit "D"**) The Agreement indicated that the first trial period payment for $2833.09 was due on September 01, 2009. The Agreement further indicated that the second payment would be due on October 01, 2009 and the third payment on November 01, 2009.

37.    Plaintiff called Defendants on July 15, 2009 and spoke with a representative named Eric to inform him that she received her trial plan agreement and requested instructions. Plaintiff stated that she will comply with the instructions by sending the first payment the following month.

38.    Plaintiff's first payment of $2,833.09 was made by cashier's check payable to CHASE/WAMU on August 24, 2009, eight (8) days before the actual due date of September 01. Plaintiff had been informed that making her TPP payment earlier would result in receiving her final modified package sooner.

39.    On September 02, 2009, Plaintiff made her second payment towards her TPP – almost 30 days ahead of its due date of October 01, 2009. Also on September 02, same day Plaintiff called CHASE/WAMU and spoke with Representative Ellis and confirmed that CHASE/WAMU has received the first payment. Plaintiff then also informed Ellis that she has already made the second payment on that day. Plaintiff asked Ellis about the NOD on her

property. Ellis informed Plaintiff that she need not be concerned with the NOD as long as she makes the TPP payments, as it is a regular procedure to have the NOD recorded.

40.     On October 5, 2009, Plaintiff completed her TPP payment. She called defendants on October 15 and spoke with Representative Bruce who confirmed receipt of the second and third payments and advised Plaintiff to continue paying her TPP payments which would help her obtain her final modification package shortly.

41.     Plaintiff made her fourth payment on November 05, 2009. On November 16, Plaintiff contacted defendants again and spoke with Representative Josh who confirmed the receipt of the fourth payment. Plaintiff asked Josh when she will receive her final package as she had already completed four payments. Josh informed her that the package will soon be completed and forwarded to her. He advised her to continue making her payments until she receives her final package.

42.     Plaintiff continued making monthly TPP payments for another nine months, totaling thirteen, and calling and confirming Defendants' receipt of her payments each month. **(Exhibit "D")** Plaintiff continued this routine until her thirteenth payment was denied without cause or explanation.

43.     While making her TPP payments, CHASE representatives repeatedly assured Plaintiff that upon approval of the loan modification the pending foreclosure proceedings would be stopped.  Plaintiff relied on the representations made by CHASE representatives.

44.     Nonetheless, Plaintiff was assured by CHASE that her loan modification documents were still under review despite the Notice of Trustee's Sale and that the sale would be postponed.

45.     Although CHASE had indicated that Plaintiff would be required to only make three trial period payments, she ultimately completed twelve such payments **(Exhibit "E")** before her thirteenth payment was rejected by CHASE **(Exhibit "F")**. In the time during which Plaintiff paid her twelve TPP payments, she did not receive a finalized modification agreement from

CHASE even though she had been told that she would. Plaintiff was not given any justification for the denial of her thirteenth payment and was subsequently dropped from her trial period plan in August 2010.

46.    After learning that she was dropped from her TPP plan without any justification, Plaintiff was told by CHASE that it was a mistake and that her status will be reinstated immediately. However, that was not the case and she was never reinstated nor did she receive a final agreement. Plaintiff contacted CHASE multiple times regarding her status but was transferred through numerous departments before finally being instructed that in order to be reinstated, she would need to reapply for the loan modification.

47.    Between August, 2010 and January, 2013 Plaintiff participated in the charade of "re-submitting" the same information requested by the bank no fewer than nine times. Plaintiff's submitted another completed Loan Modification application to CHASE on January 07, 2013.

48.    On or about January 11, 2013 Defendant CRC, on behalf of CHASE, recorded a Notice of Trustee's Sale (**Exhibit "G"**), Instrument No. 20130054941, with a sale date scheduled for February 13, 2013.

49.    On February 08, 2013 CHASE issued A TPP with 1st payment due date of March 01, 2013, 2nd payment due date of April 01, 2013 and 3rd payment due date on May 05, 2013. Said TPP plan was received by Plaintiff on or about February 10, 2013 (**Exhibit "H"**) CHASE sold the subject property at foreclosure sale on February 13, 2013.

50.    Plaintiff is informed and believes and based thereon alleges that the CHASE bank and its wholly-owned subsidiary CRC have been at all times engaged in a shell game. The game essentially involved stringing Plaintiff along with promises of modification, and requests for information, all the while moving intently and purposefully toward a foreclosure on her family home.

51.   Plaintiff relied to her detriment on this shell game in the sense that she did not seek alternatives to refinancing with CHASE, such as short sale, refinancing elsewhere, or the like.

52.   CHASE, and its agent CRC had a duty under California law to negotiate in good faith and to not engage in the deceitful practice of "dual tracking" the home loan modification process with foreclosure proceedings.

53.   Plaintiff is informed and believes, and thereon alleges, that despite the fact that she had already received two TPP's, which confirms an initial approval of a Loan Modification, Defendants CHASE and CRC wrongfully sold the subject property at the foreclosure sale.

54.   The property was purportedly purchased by PACIFIC VALUE OPPORTUNITIES FUND II, L.P. ("PVO") who then recorded, or caused to be recorded, a Trustee's Deed Upon Sale in the Official Recorder's Office for Los Angeles County, as Instrument No. 20130279365. **(Exhibit "I")**

55.   Plaintiff was not served with the Notice of Trustee's Sale recorded on January 11, 2013.

56.   Plaintiff alleges that any applicable statutes of limitations have been tolled by the Defendants' continuing, knowing, and active fraud. Despite exercising reasonable diligence, Plaintiff could not have discovered, did not discover, and was prevented from discovering, the wrongdoing complained of herein.

## **TENDER**

57.   Under Sections 1493 and 1495 of the California Civil Code, to satisfy the requirements of tender, a borrower must be willing and able to satisfy the obligation on a note. In Backus v. Sessions, 17 Cal.2d 380, 110 P.2d 51 (1941), the California Supreme Court held that the ability to tender existed where the debtor had convertible assets and the mere ability to borrow. *Id.* at 389-90, 110 P.2d at 56.

58.   Plaintiff alleges that, through all times of negotiations with CHASE/WAMU, she was

willing and able to pay the obligation on the note. Plaintiff has the ability to borrow the
necessary funds to satisfy the obligation from family members who hold assets that can be
liquidated to fund Plaintiff's loan from Defendants. As a result, based on the above
mentioned case law, Plaintiff satisfies the requirements of tender.

**FIRST CAUSE OF ACTION:**
**FRAUD**
**(AS AGAINST CHASE)**

59.     Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs
of this complaint, as though fully set forth herein.

60.     When CHASE issued the TPP agreement on February 08, 2013, CHASE knew that it was
false that it would actually follow through and honor its agreement to allow Plaintiff to
perform compliance with the terms of TPP to obtain a loan modification. Defendant
knowledge of the falsity is supported by the fact that foreclosure process was dual tracking
with the loan modification process and that Defendant so swiftly proceeded to sale the
subject property at the foreclosure sale only five days after the issuance of TPP and the
falsity is further supported by Defendants similar failure to follow through and honor the TPP
that Plaintiff complied with in 2009.

61.     Plaintiff reasonably relied on Defendants false representation based on the then current
state of the law that when Defendant issued the TPP on February 08, 2013 that if she
complied with the terms of the TPP, which she fully intended to do, CHASE would be
legally required to provide the final loan modification, pursuant to HAMP, as it was
determined by Federal court of Appeal *Wigod v. Wells Fargo Bank*, N.A. (7th Cir. 2012) 673
F.3d 547, 556-557 (*Wigod*).

62.     Based on this reasonable reliance, Plaintiff reasonably believed that she did not need to
take any action toward preventing upcoming foreclosure sale, that the TPP itself effected the
purpose of avoiding the foreclosure sale. Plaintiff was allowed to reasonably rely on

13
**SECOND AMENDED COMPLAINT**

1    Defendants anticipated compliance with the law.

2    63.    As mentioned above in the facts, after beginning negotiations with CHASE/WAMU for a

3    home loan modification, Plaintiff was approved for a trial period plan.

4    64.    Under the United States Department of the Treasury, HAMP Supplemental Directive 09

5    01 (Apr. 6, 2009) (Directive 09 01), if the lender approves a TPP, and the borrower complies

6    with all the terms of the TPP and all of the borrower's representations remain true and

7    correct, the lender must offer a permanent loan modification. *Wigod v. Wells Fargo Bank,*

8    *N.A.* (7th Cir. 2012) 673 F.3d 547, 556-557 (*Wigod*). Directive 09 01, supra, at page 18,

9    states: "If the borrower complies with the terms and conditions of the [TPP], the loan

10   modification will become effective on the first day of the month following the trial period...."

11   65.    Plaintiff's TPP required her to complete three payments in the amount of $2833.09.

12   Plaintiff made her first payment of $2833.09 on August 24, 2009. After completing her third

13   payment under the TPP, Plaintiff contacted CHASE to inquire about the finalized

14   modification agreement.  In response, CHASE instructed Plaintiff to continue making the

15   trial payments and that she would receive her final modification packet shortly.

16   66.    Plaintiff alleges that she detrimentally relied on Defendant's representations that her loan

17   would be permanently modified upon completion of the trial program and the foreclosure

18   proceedings would be stopped.

19   67.    In reliance on Defendant's representations, Plaintiff did not seek other remedies to

20   prevent the foreclosure.

21   68.    Plaintiff further alleges that CHASE knowingly, intentionally and fraudulently promised

22   that they were reviewing her newly submitted application.

23   69.    Plaintiff alleges that had she received a denial letter that her application was not approved

24   she could have sought other remedies to foreclosure.

25   70.    Plaintiff is informed and believes, and thereon alleges that CHASE knew their

14
**SECOND AMENDED COMPLAINT**

representatives made false representations to Plaintiff and other homeowners regarding the status of their loan modification application as a calculated and unfair business practice.

71. Plaintiff alleges that as a result of Defendant's fraudulent conduct, punitive damages are appropriate to deter others from engaging in the same or similar behavior.

72. Defendant misrepresentation caused Plaintiff's damages in an amount that exceeds $100,000, loss of title and quite enjoyment of the subject property and derogatory credit rating due to unlawful foreclosure of the subject property and to be further proven at trial.

73. Plaintiff alleges that tender is not required as it would be inequitable to require tender based on her allegations of fraud.

## SECOND CAUSE OF ACTION:
## VIOLATIONS OF THE
## HOMEOWNER'S BILL OF RIGHTS
## (AS AGAINST CHASE)

74. The recently-enacted California law called the Homeowners Bill of Rights states: "It is the intent of the Legislature that the mortgage servicer/lender offer the borrower a loan modification or workout plan if such a plan is consistent with its authority." California Civil Code § 2923.6(b). If a borrower submits financials toward a loan modification effort, then the servicer/beneficiary/bank shall not conduct a trustee's sale while the application is pending and the servicer must make a written determination that the borrower is ineligible. Civil Code § 2923.6(c).

75. Here, Plaintiff has been actively engaged in loan modification negotiations with the bank while the bank and its third party wholly-owned subsidiary have been taking the necessary steps to conduct a trustee's sale. This is in direct violation of the California Homeowners' Bill of Rights. This activity as alleged herein, above, was conducted after January 1st 2013, the effective date of the "Homeowners Bill of Rights"

76. Also under this new law, the mortgage servicer must establish a single point of contact

15

1    and provide one or more direct means of communication with the single point of contact.

2    Civil Code § 2923.7(a). That contact shall be responsible for communicating the process for

3    foreclosure prevention alternatives and coordinating receipt of all documents associated with

4    same. Id. at (b)(1). Further, that point of contact shall have access to all current information

5

6    and timely provide same to adequately inform the borrower. Id., (b)(2) and (3).

7    77.    Here, one of Plaintiff's primary problems is that she couldn't obtain a straight answer

8    from any of the bank's myriad number of purported representatives. Instead she has been

9    shuttled from one "department" within the monolithic corporate structure to the next, and

10    invariably the path of communication leads to a wall of frustration. This fraudulent structure

11    and approach finally caused Plaintiff's property to be wrongfully foreclosed. This is a

12    primary wrong that the new California law was meant to right.

13

### THIRD CAUSE OF ACTION:
### NEGLIGENT MISREPRESENTATION
### (AS AGAINST CHASE)

16    78.    Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs

17    of this complaint, as though fully set forth herein.

18    79.    Plaintiff alleges the identical facts and elements in this cause of action as alleged in the

19    fraud cause of action, herein, except that Plaintiff alleges that instead of defendant, CHASE

20    having knowledge of the falsity of the representations made therein, CHASE did not have a

21

22    reasonable basis upon which to believe the truthfulness of its own representations made, as

23    alleged, therein.

24    80.    Plaintiff alleges that as a result of Defendant's fraudulent conduct, punitive damages are

25    appropriate to deter others from engaging in the same or similar behavior.

26    81.    Defendant's misrepresentation caused Plaintiff's damages in an amount that exceeds

27

28    $100,000, loss of title and quite enjoyment of the subject property and derogatory credit

rating due to unlawful foreclosure of the subject property and to be further proven at trial.

## FOURTH CAUSE OF ACTION:
### VIOLATION OF BUSINESS & PROFESSIONS CODE §17200
### (AS AGAINST CHASE, CRC)

82.     Plaintiff re-alleges and incorporate the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

83.     The Court has jurisdiction over this action pursuant to Business and Professions Code §§ 17200 et seq., specifically Business and Professions Code §17203, which provides any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction; and the court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and Business and Professions Code §17204, which provides for actions for any relief pursuant to the Unfair Competition Law to be prosecuted exclusively in a court of competent jurisdiction by any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.

84.     Plaintiff alleges that Defendants engaged in deceptive business practices by engaging in fraud, as alleged, herein and by way of the pattern of issuing a TPP that it repeatedly had not honored and breached, as alleged, herein.  CHASE representatives assured Plaintiff, primarily by way of the February 8, 2013 TPP that she would be reinstated to the trial payment program, that CHASE agreed to such trial payments, which would reasonably extinguish the purpose of a foreclosure of the subject property, and CHASE wrongfully blocked such ability for plaintiff to reasonably perform and comply because  CHASE sold the subject property at the February 13, 2013 foreclosure sale. This was a deceptive pattern stringing from the alleged activity of CHASE improperly not providing a loan modification

after plaintiff's TPP compliance in 2009 and by blocking plaintiff's reasonable ability to comply with the 2013 TPP.

85.   Defendants failed to permanently modify Plaintiff's loan. Instead, they told her that she had to resubmit her loan modification application. Plaintiff resubmitted the application and was told that her loan was under review. However, Defendants had no intention of modifying her loan and proceeding with foreclosure, despite their assertions that the foreclosure would be stopped.

86.   The acts of the Defendants above constitute unfair business practices and/or acts, as defined in California Business and Professions Code §§17200 and 17500, as the acts were in violation of established California public policies to promote and preserve home ownership and to prevent foreclosures (Civ. Code §§1695(b), 2923.5 and 3412).

87.   By reason of Defendants' fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, Defendants have violated California Business and Professions Code §§ 17200 et seq. by consummating an unlawful, unfair and fraudulent business practice, designed to deprive Plaintiff of her home, equity, as well as her past and future investment.

88.   Plaintiff has suffered damages in the form of economic damages, as well as mental and emotional distress.

89.   The totality of these actions by Defendants constitutes an unfair business practice on the citizens of California and more specifically on the Plaintiff herein.

90.   As a direct and proximate cause of the acts of the named Defendants, Plaintiff's home was foreclosed upon, she suffered damage to her credit, emotional distress, and consequential damages in an amount to be fully determined at time of trial, but in an amount exceeding $1,000,000.00 to date, and is entitled to all statutory damages as provided by California law.

### SEVENTH CAUSE OF ACTION:
### PROMISSORY ESTOPPEL
### (AS AGAINST CHASE)

91.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

92.    Plaintiff submitted a loan modification application.  CHASE advised Plaintiff that in order to receive a permanent loan modification she had to complete the trial payment program. CHASE represented to Plaintiff that if she completed the program the pending foreclosure would be stopped and her loan would be permanently modified. Defendant's issuance of the February 8, 2013 TPP letter constituted a promise by CHASE to plaintiff a method by which plaintiff would obtain a loan modification and was a de facto promise not to foreclose on the subject property, provided plaintiff complied with the terms of the TPP.

93.    Plaintiff  breached said promise by proceeding to sell the subject property at the February 13, 2013 foreclosure sale.

94.    Plaintiff reasonably relied on Defendant's promise, particularly with the change in California law as of January 1, 2013 that disallowed "dual tracking" of the loan modification process, and that plaintiff, given a reasonable ability to comply with the terms of the TPP, would result in CHASE being required to provide a loan modification.

95.    As a result of plaintiff's reasonable reliance on CHASE'S promise, herein, caused Plaintiff's damages in an amount that exceeds $100,000, loss of title and quite enjoyment of the subject property and derogatory credit rating due to unlawful foreclosure of the subject property, according to proof at trial.

## JURY TRIAL

Plaintiff demands a jury trial of all triable issues of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  For Compensatory Damages in an amount to be determined by proof at trial;

2. For Special Damages in an amount to be determined by proof at trial;

3. For General Damages in an amount to be determined by proof at trial;

4. For Punitive Damages as allowed by law;

5. For Restitution as allowed by law;

6. For Attorney's Fees and Costs of this action;

7. For Declaratory Relief, including but not limited to the following Decrees of this Court that Plaintiff is the prevailing party;

8. For Injunctive Relief including but not limited to;

    a. Preliminary and Permanent Injunction enjoining any and all Trustee Sales which may be scheduled by the Defendants herein;

    b. An Order prohibiting Defendants, and each of them, from filing an unlawful detainer action or any other action against Plaintiff;

9. For Quiet Title against all Defendants whereby legal title and possession of the Property is transferred to Plaintiff;

10. For Rescission of all Notices recorded against the Property, including, Notices of Default, Notices of Trustee's Sale, and Trustee's Deed Upon Sale;

11. For any prejudgment or other interest according to law; and

12. Any other and further relief that the Court considers just and proper.

13. For this court to permit amendment of this complaint in the event this court finds that there are correctable defects in the claims made, herein, or in the event Plaintiff discovers further facts that support additional related claims.

SECOND AMENDED COMPLAINT

Dated: November 5, 2013

Respectfully submitted,

Craig E. Munson
Attorney for Plaintiff

SECOND AMENDED COMPLAINT

1

## VERIFICATION

2

3 I, <u>SRBOUI ESKIDJIAN</u> declare:

4 I am the PLAINTIFF in the above-entitled matter.
I have read **Plaintiff's Second Complaint** and declare, under penalty of perjury, that I have a
5 good faith basis for the allegations and contentions made therein.

6 I declare under penalty of perjury under the laws of the State of California that the foregoing
responses are true and correct.
7

8

Executed on November 5, 2013, Los Angeles County, California.
9

10

11 *Srboui Eskidjian*
_____
12 Srboui Eskidjian

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

1

## Proof of Service

2   I am employed in the County of Los Angeles, State of California.  I am over the age o 18 and not
3   a party to the within action; my business address is 7528 Clybourn Ave. Sun Valley, CA 91352.

4   On November 06 , 2013, I served the forgoing document(s) entitled: **Second**
    **Amended Complaint** on all parties in this action as follows:

5
6                        **PLEASE SEE ATTACHED SERVICE LIST**

7   <u>XXX</u>          **By Mail.** By placing a true and copy thereof enclosed in a sealed envelope. I am
8                        "readily familiar" with the firm's practice of collection and processing for
                         mailing  Under that practice it would be deposited with the US Post Service on
9                        that same day with first class postage thereon fully paid at Sun Valley, California
                         in the ordinary course of business. I am aware that on motion of the party served,
10                       service is presumed invalid if the postal cancellation date or the postage meter is
11                       more than one day after day of deposit for mailing of this Proof of Service.

12
13  <u>XXX</u>          **By Telefax.** I transmitted said document by telefax to the offices of the addresses
                         at the telefax numbers on the attached Service List.
14

15  _____          **By Personal Service.** I delivered such envelope by hand to the addressee(s).

16
17  _____          **By Overnight Courier.** I caused the above-referenced document (s) to be
                         delivered to an overnight courier service for next day delivery to the addressee(s)
18                       on the attached Service List.

19  I declare under penalty of perjury under the laws of the State of California that the foregoing is
20  true and correct.

21  Executed on November 06 2013, at Sun Valley, California.

22

23                                     Agness

24

25

26

27

28  _____
                        **PROOF OF SERVICE**

## Service List

1.  Bentley Paul Stansbury III
    Keesal, Young & Logan
    400 Oceangate
    P.O. Box 1730
    Long Beach, CA 90801
    T: 562-436-2000
    F: 562-436-7416

    *Attorney for Defendant JP Morgan Chase National Corporate Services Inc.*

**PROOF OF SERVICE**

# EXHIBIT A

# "NOTICE OF DEFAULT"

This page is part of your document - DO NOT DISCARD



**20090409488**

Pages:
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**03/23/09 AT 08:00AM**

| | |
|---|---|
| FEES: | 14.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 14.00 |



LEADSHEET



200903230190001

00000230284



002021804

SEQ:
17

DAR - Title Company (Hard Copy)

THIS FORM IS NOT TO BE DUPLICATED

T35

2

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800 892-6902
(818)775-2258 (Fax)



03/23/2009

*20090409488*

Space above this line for recorder's use only

Trustee Sale No. 730820CA   Loan No. 3010270811   Title Order No. 090204821-CA-MAI

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).**

**This amount is $18,235.90 as of March 20, 2009 and will increase until your account becomes current.**

**While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.**

**Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).**

**Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.**

3

Trustee Sale No. 730820CA   Loan No. 3010270811   Title Order No. 090204821-CA-MAI

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Association, at 7301 BAYMEADOWS WAY , JACKSONVILLE, FL 32256, (877) 926-8937.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

**REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY** is the duly appointed Trustee under a Deed of Trust dated 08/04/2006, executed by SRBOUI ESKIDJIAN, AN UNMARRIED WOMAN, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 08/10/2006, Book , Page , Instrument 06 1776887 of official records in the Office of the Recorder of LOS ANGELES County, California, as more fully described on said Deed of Trust. APN: 2456-035-025 Situs: 410 S BEL AIRE DRIVE, , BURBANK, CA 91501 Including the note(s) for the sum of $700,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 11/01/2008 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of §2935.5.

DATE: March 20, 2009

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

_____
Colleen Irby, Assistant Secretary

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# EXHIBIT B

## "NOTICE OF TRUSTEE'S SALE"

This page is part of your document - DO NOT DISCARD



## 20090999578



Pages:
0004

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**07/02/09 AT 08:00AM**

| | |
|---|---|
| FEES: | 18.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 18.00 |



**LEADSHEET**



200907020220009

00000802742



002185866

**SEQ:
01**

DAR - Title Company (Hard Copy)

**THIS FORM IS NOT TO BE DUPLICATED**                 t35

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800-892-6902


07/02/2009
*20090999578*

Trustee Sale No.   730820CA
Loan No.           3010270811
Title Order No.    090204821-CA-MAI

Space above this line for recorder's use only

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08/04/2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 07/28/2009 at 10:30 AM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08/10/2006, Book , Page , Instrument 06 1776887,     of official records in the Office of the Recorder of LOS ANGELES County, California, executed by: SRBOUI ESKIDJIAN, AN UNMARRIED WOMAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust.   The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Place of Sale: THE FRONT ENTRANCE TO THE POMONA SUPERIOR COURTS BUILDING, 350 W. MISSION BOULEVARD, POMONA, CA

Legal Description: PARCEL 2 OF PARCEL MAP NO. 4395, IN THE CITY OF BURBANK, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 50 PAGE 33 OF PARCEL MAPS OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

Amount of unpaid balance and other charges: $804,288.19 (estimated)

Street address and other common designation of the real property:   410 S BEL AIRE DRIVE
                                                                     BURBANK, CA 91501
                                                                     APN Number:  2456-035-025

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 06-25-2009                                        **SEE ATTACHED EXHIBIT**

CALIFORNIA RECONVEYANCE COMPANY, as Trustee
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Exhibit

## DECLARATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2923.54

Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as follows:

1. It has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.54 that is current and valid on the date the notice of sale is filed; and

2. The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55.

JPMorgan Chase Bank,
National Association

Name:  Ann Thorn
Title:    First Vice President

# EXHIBIT C

## "DEED OF TRUST"

This page is part of your document - DO NOT DISCARD

## 06 1776887

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
## 08/10/06 AT 08:00am

## TITLE(S) :



L E A D    S H E E T

FEE

FEE $13-HH
DAF $ 2-
C-20

13

D.T.T.

NOTIFICATION SENT $4

CODE
20

CODE
19

CODE
9____

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.     Number of AIN's Shown

THIS FORM IS NOT TO BE DUPLICATED

**FIDELITY-VAN NUYS**

Recording Requested By:

WASHINGTON MUTUAL BANK   FA

Return To:

WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

06  1776887

Prepared By:

ANNETTE CASTRO

19478208

─────────────── (Space Above This Line For Recording Data) ───────────────

ZCA1
M35

2456-035-025

# DEED OF TRUST

3010270811-868

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  AUGUST 04, 2006
together with all Riders to this document.

(B) "Borrower" is  SRBOUI ESKIDJIAN, AN UNMARRIED WOMAN

Borrower's address is  410 S BEL AIRE DRIVE, BURBANK, CA 91501
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is  WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01

-6(CA) (0207)

Page 1 of 15        Initials:

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated AUGUST 04, 2006
The Note states that Borrower owes Lender SEVEN HUNDRED THOUSAND AND 00/100
Dollars
(U.S. $    700,000.00    ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than SEPTEMBER 01, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

Initials _____

-6(CA) (0207)                    Page 2 of 15                    Form 3005 1/01

06 1776887

4

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY                              of  LOS ANGELES                              :

           [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT "A" AND IS MADE A PART HEREOF.

Parcel ID Number:  2456035025                          which currently has the address of

410 S BEL AIRE DRIVE                                                                  [Street]

BURBANK                                            [City], California  91501      [Zip Code]

("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

    -6(CA) (0207)                      Page 3 of 15                 Initials: *signature*               Form 3005 1/01

06 1776887

5

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

08/19/06

-6(CA) (0207)                    Page 4 of 15                    Initials: _____                    Form 3005 1/01

06 1776887

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

-6(CA) (0207)     Page 5 of 15     Initials: ___     Form 3005 1/01

06 1776887

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

-6(CA) (0207)                    Page 6 of 15          Initials: _____          Form 3005 1/01

06 1776887

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

-6(CA) (0207)     Page 7 of 15     Initials: _____     Form 3005 1/01

06 1776887

9

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

06 1776887

/0

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

08/10/06

-6(CA) (0207)                    Page 9 of 15                    Initials: ___                    Form 3005 1/01

06 1776887

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

Initials: _____

-6(CA) (0207)                                         Form 3005 1/01

06 1776887

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

06 1776887

/3

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

-6(CA) (0207)                    Page 12 of 15          Initials _EK_          Form 3005 1/01

06 1776887

14

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

08/19/05

-6(CA) (0207)                    Page 13 of 15              Initials _EA_              Form 3005 1/01

06 1776887

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _Srboui Eskidjian_____ (Seal)
                                                                      -Borrower
                                     SRBOUI ESKIDJIAN


_____    _____ (Seal)
                                                                      -Borrower


_____ (Seal)    _____ (Seal)
                       -Borrower                          -Borrower


_____ (Seal)    _____ (Seal)
                       -Borrower                          -Borrower


_____ (Seal)    _____ (Seal)
                       -Borrower                          -Borrower

-6(CA) (0207)                    Page 14 of 15                    Form 3005 1/01

06 1776887

State of California
County of LOS ANGELES                    } ss.

On *August 4, 2006*         before me, *Claudette Farah, a notary public*
                                                         personally appeared

SRBOUI ESKIDJIAN

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

_____ (Seal)



CLAUDETTE FARAH
Commission # 1670234
Notary Public - California
Los Angeles County
My Comm. Expires May 26, 2010

Initials: _____

06  1776887

Order No. 19478208

## EXHIBIT "A"

17

Parcel 2 of Parcel Map No. 4395, in the City of Burbank, County of Los Angeles, State of California, as per map recorded in Book 50 Page 33 of Parcel Maps of maps, in the office of the County Recorder of said county.

Assessor's Parcel No: 2456-035-025

06 1776887

2

(Rev. 11/17/04)

RCOF
M35

3010270811-868

18

# ADJUSTABLE RATE RIDER
## (FHLB Index - Payment and Rate Caps)

3010270811

THIS ADJUSTABLE RATE RIDER is made this __4TH__ day of __AUGUST, 2006_____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to __WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

__410 S BEL AIRE DRIVE, BURBANK, CA 91501_____
(PROPERTY ADDRESS)

> THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%____ OF THE ORIGINAL AMOUNT (OR $ ___770,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of __8.340_%. Thereafter until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of __2.550___%. The interest rate I will pay will thereafter change in accordance with Section 4 of the Note.
Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may further change on the first day of __OCTOBER, 2006_____, and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date".

32842 (11-01)                           Page 1 of 6                    LRD01USA (VERSION 1.0)

06 1776887

3010270811

*19*

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. This information may be available in your library, or you may write to the Federal Reserve Board, Board of Governors, Publications Services, Washington, D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate Index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

**(C) Interest Rate Change Calculation**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 25 / 100 _____ percentage points ____4.250__% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new Index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date
(or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

32842 (11-01)                    **Page 2 of 6**                    LRD01USB (VERSION 1.0)

06 1776887

3010270811 · 20

**(D) Interest Rate Limit**

My interest rate will never be greater than __10.700__% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing __OCTOBER 01, 2007__, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __110%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __110%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

08/10/06

06 1776887

RCO2

3010270811   2)

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal."

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

32842 (11-01)                    **Page 4 of 6**                    LRD01USD (VERSION 1.0)

08/01/00

06  1776887

3010270811

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

06 1776887

$\mathcal{VB}$

3010270811

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute an document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_Srboui Eskidjian_
SRBOUI ESKIDJIAN

32842 (11-01)              Page 6 of 6              LRD01USF (VERSION 1.0)

08/10/06

06 1776887

74

## ILLEGIBLE NOTARY SEAL DECLARATION

### GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary _____CLAUDETTE  FARAH_____

Date Commission Expires _____MAY 26, 2010_____

Notary Identification Number _____1670224_____
(For Notaries commissioned after 1-1-1992)

Manufacturer/Vendor Identification Number _____NNA1_____
(For Notaries commissioned after 1-1-1992)

Place of Execution of this Declaration _____NORWALK_____

Date _____AUG 1 0 2006_____

_____
Signature (Firm Name if any)
Civic Center Title Services Inc.
Cherry Miclat

06  1776887

# EXHIBIT D

## "FIRST TTP (Trial

## Payment Agreement)"



07/01/09

SRBOUI ESKIDJIAN
410 S BEL AIRE DR
BURBANK, CA 91501

WE ARE A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT,
AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

WE HAVE TOLD A CREDIT BUREAU ABOUT A LATE PAYMENT, MISSED
PAYMENT OR OTHER DEFAULT ON YOUR ACCOUNT. THIS INFORMATION
MAY BE REFLECTED IN YOUR CREDIT REPORT.

RE: Washington Mutual Loan Number: 3010270811
Dear SRBOUI ESKIDJIAN :

We understand you're experiencing some financial hardship that has resulted in you
falling behind on your home loan payments. We at Washington Mutual are able to offer
you some financial assistance.

Since you have told us you're committed to pursuing a stay-in-home option, you have
been approved for a Trial Plan Agreement. If you comply with all the terms of this
Agreement, we'll consider a permanent workout solution for your loan once the Trial
Plan has been completed.

Please sign and return the Trial Plan Agreement. We must receive the signed Agreement
at the following address on or before 08/28/09:

Washington Mutual Bank
7255 Baymeadows Way
ATTN: Default / Cash Operations
Jacksonville, FL 32256

You may also fax your signed agreement to us at 206-494-4739.

Thank you for your cooperation. If you have any questions, you can call me at 1-866-
926-8937, extension .

Sincerely,

UYEN DAO
Loan Workout Specialist
Loss Mitigation Department
Washington Mutual Bank

Enclosure

Loan Number:        3010270811

## TRIAL PLAN AGREEMENT

- Your loan is now due for the months of 08/01/09 to .
- We must receive the initial payment of $2833.09 by 09/01/09. After that, the payment schedule outlined below must be followed. If you do not make your payments on time, or if any of your payments are returned for non-sufficient funds, this Agreement will be in breach and collection and/or foreclosure activity will resume.

Your payments must be received in our office on or before the following dates:

| | |
|---|---|
| $2833.09 | 09/01/2009 |
| $2833.09 | 10/01/2009 |
| $2833.09 | 11/01/2009 |

Payments are subject to change due to escrow analysis and or interest rate changes, if applicable. If you are notified of a payment adjustment, please contact our office immediately so we can adjust the terms of your Agreement accordingly. If all payments are made as scheduled, we will reevaluate your application for assistance and determine if we are able to offer you a permanent workout solution to bring your loan current.

All of the original terms of your loan remain in full force and effect, unless specifically mentioned within this Agreement. If any part of this Agreement is breached, Washington Mutual has the option to terminate the Agreement and begin or resume foreclosure proceedings pursuant to your loan documents and applicable law.

You acknowledge that in the event you file a petition bankruptcy, Washington Mutual may elect to take any and all actions necessary, including but not limited to voiding this Agreement, filing a Motion for relief from the automatic stay or a Motion to dismiss or any permitted state law remedies, which in Washington Mutual's judgment are reasonably necessary to secure or protect our security, the value of the security and/or to enforce our rights under the original terms of your loan.

I/We agree to the above Agreement and will make payments as outlined above. I/We understand that foreclosure action can be taken if the terms of this Agreement are not met.

*Srboui Eskidjian*        07-10-2009

SRBOUI ESKIDJIAN                    Date

# EXHIBIT E

## Cashier's Checks (12)

## Paid to Chase

**Bank of America**

Cashier's Check

No. 425864575

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   AUGUST 24, 2009

11-35/1210
NCA

Banking Center   BURBANK MAIN

0000217  00003  005864575

STEPHEN ESKIDJIAN
Remitter (Purchased By)

$ **2833.09**

Pay **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

To The Order Of

**CHASE**
**SEBOUH ESKIDJIAN**

Non-Negotiable

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Customer Copy
Retain For Your Records

1397085076

---

**Bank of America**

Cashier's Check

No 425864595

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   SEPTEMBER 02, 2009

11-35/1210
NCA

Banking Center   BURBANK MAIN

0000217  00003  005864595

STEPHEN ESKIDJIAN
Remitter (Purchased By)

$ **2833 09**

Pay **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

To The Order Of

**CHASE**
**SEBOUH ESKIDJIAN**

Non-Negotiable

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Customer Copy
Retain For Your Records

1397085076

---

**Bank of America**

Cashier's Check

No. 425913875

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   OCTOBER 05  2009

11-35/1210
NCA

Banking Center   VERMONT HOLLYWOOD

0000356  00008  005913875

SEBOUH ESKIDJIAN
Remitter (Purchased By)

$ **2833 09**

Pay **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

To The Order Of

**CHASE BANK**
****

Non-Negotiable

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Customer Copy
Retain For Your Records

1397085076



Bank of America

**Cashier's Check**

No. 425914263

Notice to Purchaser  In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   NOVEMBER 05, 2005

11-35/1210
NCA

Banking Center   VERMONT HOLLYWOOD

0000356  00007  005914263

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$   **2833.09**

Pay To The Order Of   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE BANK**

Non-Negotiable

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature

Customer Copy
Retain For Your Records   1397085076



Bank of America

.Cashier's Check

No. 425866958

Notice to Purchaser  In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   DECEMBER 04, 2005

11-35/1210
NCA

Banking Center   BURBANK MAIN

0000217  00005  003866958

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$   **2833.09**

Pay To The Order Of   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE BANK**

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature

⑈425866958⑈ ⑆121000358⑈ 13970⑈85076⑈

THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK          THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK



Bank of America

Cashier's Check

No. 427003694

Notice to Purchaser  In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date   JANUARY 06, 2010

11-35/1210
NCA

Banking Center   BURBANK MAIN

0000217  00015  007003654

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$   **2833.09**

Pay To The Order Of   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE BANK**
**HOUSE PAYMENT**

Non-Negotiable

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature

Customer Copy
Retain For Your Records   1397085076



**Bank of America**

Cashier's Check

No. **427005154**

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date        FEBRUARY 05, 2010

11-35/1210
NCA

Banking Center        BURBANK MAIN

0000217  00005  007005154

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$        **2833.09**

Pay
To The Order Of

**TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE**
****

Tran 00163    02/05/2010  13:24    ACS
R/T# 540930135  CC 0000217  Tlr 00005
Acco        **Non-Negotiable**

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Official Check Sale        $2,833.09
Customer Copy        1397085076
Retain For Your Records



**Bank of America**

Cashier's Check

No. **427006163**

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date        MARCH 05, 2010

11-35/1210
NCA

Banking Center        BURBANK MAIN

0000217  00003  007006163

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$        **2833.09**

Pay
To The Order Of

**TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE**
****

**Non-Negotiable**

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Customer Copy        1397085076
Retain For Your Records

**Bank of America**

Cashier's Check

No. **427006269**

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Date        APRIL 05, 2010

11-35/1210
NCA

Banking Center        BURBANK MAIN

0000217  00007  007006269

SRBOUI ESKIDJIAN
Remitter (Purchased By)

$        **2833.09**

Pay
To The Order Of

**TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**

**CHASE BANK**
****

**Non-Negotiable**

Bank of America, N.A.
San Francisco, CA

VOID AFTER 90 DAYS

Authorized Signature
Customer Copy        1397085076
Retain For Your Records



**Bank of America**

Cashier's Check

No. 427006424

11-35/1210
NCA

Date   MAY 05, 2010

Banking
Center   BURBANK MAIN

0000217   00007   007006424

SRBOUI ESKIDJIAN
Remitter (Purchased By)

Pay   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**   $   **2833.09**

To
The
Order
Of   **CHASE BANK**
****

Non-Negotiable

Authorized Signature

Bank of America, N.A.
San Francisco, CA   VOID AFTER 90 DAYS

Customer Copy
Retain For Your Records   1397085076

05-14-3774B 01-2009



**Bank of America**

Cashier's Check

No. 427007278

11-35/1210
NCA

Date   JUNE 04, 2010

Banking
Center   BURBANK MAIN

0000217   00007   007007278

SRBOUI ESKIDJIAN
Remitter (Purchased By)

Pay   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**   $   **2833.09**

To
The
Order
Of   **CHASE BANK**
****

Non-Negotiable

Authorized Signature

Bank of America, N.A.
San Francisco, CA   VOID AFTER 90 DAYS

Customer Copy
Retain For Your Records   1397085076

05-14-3774B 01-2009



**Bank of America**

Cashier's Check

No. 427007789

11-35/1210
NCA

Date   JULY 06, 2010

Banking
Center   BURBANK MAIN

0000217   00007   007007789

SRBOUI ESKIDJIAN
Remitter (Purchased By)

Pay   **TWO THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 09 CENTS**   $   **2833.09**

To
The
Order
Of   **CHASE BANK**
****

Authorized Signature

Bank of America, N.A.
San Francisco, CA   VOID AFTER 90 DAYS

05-14-3774B 01-2009

⑆427007789⑆ ⑈121000358⑈ 13970⑆85076⑈

THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK   THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK

# EXHIBIT F

## "Rejected Check"



**Chase Home Finance LLC**

3415 Vision Drive          OH4-7126
Columbus, OH 43219-6009
(800) 848-9136 Customer Care
(800) 582-0542 TDD / Text Telephone

Thursday, August 12, 2010

SRBOUI ESKIDJIAN
410 S BEL AIRE DR
BURBANK, CA 915011502

Dear Customer(s),

This letter is in response to your check we recently received.

| LOAN # | CHECK # | AMOUNT |
|--------|---------|--------|
| 3010270811 | 2529 | $2,833.09 |

Chase cannot accept this payment because of the following reason.

Funds insufficient to cure default.

Chase's goal is to provide the highest level of quality service. If you can assist us with this matter please contact the Foreclosure Department at 1-800-981-3792 anytime Monday through Friday from 8:00 a.m. to 4:30 p.m., Eastern Time.

Sincerely,
Default Loan Services Department
Enclosure

770020100812

**SRBOUI ESKIDJIAN**
410 S BELAIRE DR (818) 846-0090
BURBANK, CA 91501

2529

16-66/1220
217

Check Received
Date 8-05-10
AUG 10 2010

Pay to the Order of _CHASE_   **DRA**   | $ 2833 09/00

_Two thisend eight hundred thirthethree and 09/00_ Dollars

**Bank of America**
Burbank Main
142 E Olive Ave
Burbank CA
818.507.6100

Customer Since 1980

For _LOAN of (3010270811)_   _Srboui Eskidjian_ MP

⑆122000661⑆ 2529 ⑈0270⑈27468⑆

---

Employee Statement of Earnings - Payroll Male (213)241-6670 or (press-press)valued.net

| Name | Per End | SB | PS-Grp | PL | PERNR | Cost Ctr | Rate | Hours | Gross | | Tax Exemptions |
|------|---------|-----|--------|-----|-------|----------|------|-------|-------|---|---------------|
| ESKIDJIAN, SRBOUI | | EE ID 318491 | Payroll Period 09/01/09 To:09/30/09 | | | Pay Date 10/05/09 | Payroll Payment PS-Area 8705508 | Cert | UT | | FED / M / Exemptic<br>CA / M / Exempsi |

**CURRENT PAY**

| | | | | | | | Rate | Hours | Gross | |
|---|---|---|---|---|---|---|------|-------|-------|---|
| Regular Time Pay | 09/30/09 | 0 | 24 | 10 | 00318491 | 01822601 | 96.00 | 5,296.08 | Full Pay Illness | |
| C-Basis Salary | 09/30/09 | 0 | 24 | 10 | 00318491 | 01822601 | | | Half Pay Illness | |
| Special Assignment | 09/30/09 | 0 | 24 | 10 | 00318491 | 01822601 | 52.39931 | 943.19 | Leave HRS | |
| Masters Degree | 09/30/09 | 0 | 24 | 10 | 00318491 | 01822601 | 0.48 | 45.79 | | |

| Payments | Current | YTD | Post-Tax Deductions | Current | YTD | Totals | Current |
|----------|---------|-----|---------------------|---------|-----|--------|---------|
| | | | United Teachers L A Du | 57.42- | 574.20- | Gross | 6,285.06 |
| | | | United Teach of L A Pre | 12.92- | 129.20- | Imputed Income | 0.00 |
| | | | United Way of Greater | 2.00- | 20.00- | Pre-Tax Deduct | 702.80- |
| **Pre-Tax Deductions** | Current | YTD | | | | Taxable Earnings | 5,582.26 |
| 403B Pre-Tax | 200.00- | 1200.00- | | | | FED Withholding | 421.71- |
| STRS EE | 502.80- | 4714.60- | | | | CA Withholding | 119.44- |
| | | | | | | | |
| | | | | | | **Hours Summary** | |
| | | | | | | Contract Hrs | |
| | | | | | | Reported Hrs | |
| | | | | | | Remaining Hrs | |
| | | | | | | Fiscal Hrs Paid | |
| | | | | | | **Annualized Status** | |
| | | | | | | Earned Amt | |
| | | | | | | Paid Amt | |
| | | | | | | Difference | |
| | | | | | | **District Paid Ben** | |
| | | | | | | Blue Cr HMO P (A) | |
| | | | | | | VSP(K) ER | |
| | | | | | | MetLife DPO ER | |
| | | | | | | EAP ER | |
| | | | | | | Employee Basic L1 | |
| | | | | | | STRS ER | |
| | | | | | | | |
| | | | | | | Post-Tax Deduct | 72.34- |
| | | | | | | Non-Tax Reimburs | 0.00 |

(rev 2) 8/06

# EXHIBIT G

## "Second Notice of Trustee's Sale"



This page is part of your document - DO NOT DISCARD



# 20130054941

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**01/11/13 AT 08:00AM**

Pages:
0004

| | |
|---|---|
| FEES: | 24.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 24.00 |





LEADSHEET



201301110210012

00007074568

004569787

SEQ:
21

DAR - Title Company (Hard Copy)



THIS FORM IS NOT TO BE DUPLICATED

t35

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

**Trustee Sale No.**  **730820CA**
Loan No.          3010270811
Title Order No.   090204821-CA-MAI

01/11/2013

*20130054941*

Space above this line for recorder's use only

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08-04-2006.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 02-13-2013 at 9:00 AM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08-10-2006, Book N/A, Page N/A, Instrument 06 1776887,  of official records in the Office of the Recorder of LOS ANGELES County, California, executed by:  SRBOUI ESKIDJIAN, AN UNMARRIED WOMAN, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state.  Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust.   The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below.  The amount may be greater on the day of sale.

Place of Sale: Doubletree Hotel Los Angeles-Norwalk, 13111 Sycamore Drive, Norwalk, CA 90650

Legal Description:  PARCEL 2 OF PARCEL MAP NO. 4395, IN THE CITY OF BURBANK, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 50 PAGE 33 OF PARCEL MAPS OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Amount of unpaid balance and other charges: $802,525.30 (estimated)

Street address and other common designation of the real property:    410 S BEL AIRE DRIVE
                                                  BURBANK, CA 91501
                                                  APN Number:  2456-035-025

        The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone;  by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

DATE: 01-09-2013

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

DEREK WEAR-RENEE, ASSISTANT SECRETARY

California Reconveyance Company
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA  91311
800-892-6902

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

For Sales Information:
www.lpsasap.com or 1-714-730-2727
www.priorityposting.com or 1-714-573-1965
www.auction.com or 1-800-280-2832

4

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, this information can be obtained from one of the following three companies:
LPS Agency Sales & Posting at (714) 730-2727, or visit the Internet Web site www.lpsasap.com (Registration required to search for sale information) or Priority Posting & Publishing at (714) 573-1965 or visit the Internet Web site www.priorityposting.com (Click on the link for "Advanced Search" to search for sale information), or auction.com at 1-800-280-2832 or visit the Internet Web site www.auction.com, using the Trustee Sale No. shown above. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

# EXHIBIT H

# "Second TTP"

Loan Number    3010270811

# CHASE 

2210 ENTERPRISE DRIVE
FLORENCE, SC 29501-1109

FEBRUARY 08, 2013

SRBOUI ESKIDJIAN

**You have been approved for a trial plan that could make your
payments more affordable for the long term.
Make your new payments on time each month!**

410 S BEL AIRE DR
BURBANK, CALIFORNIA 91501-1502

Account:          3010270811
Property Address:  **410 S BEL AIRE DR
BURBANK, CALIFORNIA 91501**

Dear SRBOUI ESKIDJIAN:

You are approved to enter into a trial period payment plan. Now, it's time to take the next step in achieving long-term affordability for your home. Your Trial Period Plan is explained below.

Your Chase Trial Period Plan (TPP) payment schedule is shown in the table. Make these payments instead of your regular monthly payment. Call us or just make your first trial plan payment on time to accept this offer. **By making the first trial payment, you are accepting the terms of this plan, including the Additional Terms and Conditions set forth below.**

| TPP Amount | TPP Due Date |
|------------|--------------|
| $ 2,956.49 | 03/01/2013   |
| $ 2,956.49 | 04/01/2013   |
| $ 2,956.49 | 05/01/2013   |

**If your first payment is not received at the address below by**      **the payment plan will not be valid. Collection and/or foreclosure action may commence or continue.** Your first payment must be made using one of the payment coupons enclosed, payable to CHASE PAYMENT PROCESSING and mailed to:

**CHASE PAYMENT PROCESSING
PO BOX 78420
PHOENIX AZ 85062-8420**

Be sure to write your account number on your check. If you submitted two or more insufficient funds (NSF) checks within the past six months, certified checks are required for your trial plan payments.

Accepting this trial period plan may have a negative impact on your credit rating. See the attached Important Information section for more information.

If you have any questions, please call us at one of the telephone numbers listed below.

Sincerely,

Chase
(800) 848-9380
(800) 841-1743  TDD / Text Telephone

**See the Important Information to follow.**

Page 1 of 2

## ADDITIONAL TRIAL PERIOD PLAN TERMS AND CONDITIONS

Once the Trial Period Plan (TPP) begins, if you do not meet the terms of this Plan, JPMorgan Chase Bank, N.A. ("we"/"our") may, without further notice to you, terminate the Plan and commence or continue collection and/or foreclosure proceedings according to the terms of your Note and Security Instrument. **Note that the TPP will not bring your account current during the trial period.** Your final modified payment should be close to your trial payment, but we reserve the right to adjust the modified payment to take into account final amounts of unpaid interest, additional expenses and advances, and any other delinquent amounts (except late charges) to be added to your loan balance. After successful completion of the TPP, we will send you a Modification Agreement for your signature which will modify the Loan as necessary to reflect this new payment amount, as well as any other changes to the terms of your Loan.

You acknowledge that in the event you file a petition in bankruptcy, we may elect to take any and all actions, including, but not limited to, voiding this Agreement, filing a Motion for Relief from Automatic Stay or a motion to dismiss or any permitted state law remedies, which in our judgment are reasonably necessary to protect our security and/or to enforce our rights under the original terms of your Loan.

The terms of your TPP below are effective on the day you make your first TPP payment, provided you have paid it on or before **March 01, 2013.** You and we agree that:

1. **This TPP is not a permanent modification. You must make all of your TPP payments on time and continue to meet all program requirements before we can offer you a final modification.**
   - The terms of any final modification will be reflected in the permanent Modification Agreement that will be sent to you if you complete the TPP.
   - There are no monetary incentives for timely payments under this program. However, you may be offered principal forgiveness as part of the final modification, which could have tax consequences. You should check with your tax advisor on how this affects your situation.

2. **We will not proceed to foreclosure sale during the trial period, provided you comply with the terms of the TPP. However, any pending foreclosure action or proceeding will not be dismissed and may be immediately resumed if you default in the TPP.** A new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will not be necessary to continue the foreclosure action. You waive any and all rights to receive such foreclosure notices to the extent permitted by applicable law.

3. **During the trial period, we may accept and post your TPP payments to your account and it will not affect foreclosure proceedings that have already been started.**
   - The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan or foreclosure action and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.
   - We may also send legal notices required in connection with foreclosure actions and related activities during the trial period.

4. **If your monthly payment did not include escrows for taxes and insurance, you are now required to do so.** You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account even if your loan is not modified.

5. **Your current loan documents remain in effect; however, you should make the TPP payment instead of the payment required under your loan documents.** You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect during the trial period and you will comply with those terms, and that nothing in the TPP shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

**IMPORTANT INFORMATION**

**We are a debt collector.**

Your credit score may be adversely affected by accepting this trial period plan. During the trial period we will continue to report your mortgage loan payment status to the credit reporting agencies. If your loan was delinquent when you entered the Plan, we will continue to report your loan as delinquent even if you are making your trial payments on time. If your loan was current when you entered the Plan, and you make each trial period payment on time, we will report your loan as current, paying under a partial payment agreement. Once the modification is complete we will report the modification to the credit bureaus as modified under a federal government plan or loan modified based on the modification type and will report your loan as current if payments are received within 0 to 29 days of due date. Completing a modification will NOT change previous adverse reporting. The impact of a permanent modification on a credit score depends on the homeowner's entire credit profile. For more information about your credit score, go to http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

**If you are represented by an attorney, please refer this letter to your attorney and provide us with the attorney's name, address, and telephone number.**

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this notice is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation.**

# EXHIBIT I

"Trustee's Deed Upon Sale"

**This page is part of your document - DO NOT DISCARD**



## 20130279365



**Pages: 0003**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**02/22/13 AT 02:41PM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 706.20 |
| OTHER: | 0.00 |
| PAID: | 737.20 |



**L E A D S H E E T**



201302220920017

**00007288226**

004670222

**SEQ:
01**

DAR - Counter (Upfront Scan)

**THIS FORM IS NOT TO BE DUPLICATED**

WHEN RECORDED MAIL TO:
PACIFIC VALUE OPPORTUNITIES FUND II, L.P.

MAIL TAX STATEMENTS TO:
PACIFIC VALUE OPPORTUNITIES FUND II, L.P.
10990 WILSHIRE BLVD #420
LOS ANGELES, CA 90024

---

Space above this line for recorder's use only

Trustee Sale No. 730820CA   Loan No. 3010270811   Title Order No. 090204821-CA-MAI

## TRUSTEE'S DEED UPON SALE

APN 2456-035-025   T.R.A. No.
The undersigned grantor declares:
1)   The Grantee herein was not the foreclosing beneficiary.
2)   The amount of the unpaid debt together with costs was ..................$954,137.69
3)   The amount paid by the grantee at the trustee sale was..................$642,000.00
4)   The documentary transfer tax is ......................................................$706.20 *(12)*
5)   Said property is in BURBANK
and CALIFORNIA RECONVEYANCE COMPANY (herein called Trustee), as the duly appointed
Trustee or substituted Trustee under the Deed of Trust hereinafter described, does hereby grant and
convey, but without covenant or warranty, express or implied, to PACIFIC VALUE OPPORTUNITIES
FUND II, L.P. (herein called Grantee), all of its right, title and interest in and to that certain property
situated in the County of LOS ANGELES, State of California, described as follows:  PARCEL 2 OF
PARCEL MAP NO. 4395, IN THE CITY OF BURBANK, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 50 PAGE 33 OF PARCEL MAPS OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Situs: 410 S BEL AIRE DRIVE, , BURBANK, CA 91501
RECITALS:
This conveyance is made pursuant to the powers conferred upon Trustee by that certain Deed of
Trust dated 08-04-2006 and executed by SRBOUI ESKIDJIAN, AN UNMARRIED WOMAN, as
Trustor, and Recorded 08-10-2006, Book N/A, Page N/A, Instrument 06 1776887 of official records
of LOS ANGELES County, California, and after fulfillment of the conditions specified in said Deed of
Trust authorizing this conveyance.

Default occurred as set forth in a Notice of Default and Election to Sell which was recorded in the
Office of the Recorder of said County, and such default still existed at the time of sale.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the
Notice of Default or the personal delivery of the copy of the Notice of Default and the posting and
publication of copies of the Notice of a Sale have been complied with.

Trustee Sale No. 730820CA    Loan No. 3010270811    Title Order No. 090204821-CA-MAI

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its powers under said Deed of Trust, sold the herein described property at public auction on 02-13-2013. Grantee, being the highest bidder at said sale, became the purchaser of said property for the amount bid being $642,000.00 in lawful money of the United States, or by credit bid if the Grantee was the beneficiary of said Deed of Trust at the time of said Trustee's Sale.

DATE: 02-19-2013

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

Dalila Ochoa,    Assistant Secretary

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On February 19, 2013 before me,    ISABEL P. CABRERA    , "Notary Public" personally appeared DALILA OCHOA, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature    Isabel P. Cabrera    (Seal)

ISABEL P. CABRERA
Commission # 1867322
Notary Public - California
Los Angeles County
My Comm. Expires Oct 18, 2013